**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY P. BARNES, ET AL., | No. C 12-1334 CRB |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| THE HERSHEY COMPANY, | |
| Defendant. | |

Now pending is Hershey's motion for partial summary judgment in an age discrimination suit. Hershey argues that it is entitled to summary judgment on (1) Bolle's and Wasson's ADEA claims based on signed release agreements and (2) Barnes' FEHA claim based on failure to exhaust administrative remedies. The Court DENIES summary judgement with respect to the ADEA claims, but would entertain a similar future motion once the record is more complete. The Court GRANTS summary judgment for Hershey with respect to the FEHA claims of Barnes.

**I.    BACKGROUND**

Gregory P. Barnes, David C. Bolle, and Mary D. Wasson ("Plaintiffs") brought suit against The Hershey Company ("Hershey") alleging Plaintiffs were fired as part of a plan by Hershey to terminate "longer-term, older workers." Bolle Decl. (dkt. 53) ¶ 24. Plaintiffs allege that "[u]pwards of twenty older workers were ousted during this particular effort by Hershey." Id.

United States District Court
For the Northern District of California

1

2        Barnes

3        Barnes joined Hershey in 1983 and worked there until his termination in April 2011.

4   Answer (dkt. 9) ¶ 11.  During his career at Hershey, Barnes held the positions of District

5   Account Supervisor, District Manager, District Account Manager, and Senior Regional

6   Analyst while being promoted or transferred several times, including stints in Nashville,

7   Kansas City, Atlanta, and Houston.  Answer ¶¶ 15, 20, 22, 24, 26.  According to Plaintiffs,

8   six months after Barnes disclosed that his wife had breast cancer, Hershey terminated his

9   position and offered him relocation to Pleasanton, CA, which Barnes could not accept

10  because of his wife's medical care requirements.  Barnes Decl. (dkt. 52) Ex. E ¶ 11.  Barnes

11  unsuccessfully applied to two other positions within Hershey after being notified of his

12  pending termination.  Answer ¶¶ 35-36.  Following Barnes' termination, he filed charges of

13  discrimination with the Pennsylvania Human Relations Commission, Texas Workforce

14  Commission Civil Rights Division, and the EEOC.  Barnes Charge of Discrimination (dkt.

15  48) Ex. 5.

16       Bolle

17       Bolle joined Hershey in 1994 and worked there until his termination in September

18  2010.  Bolle Decl. ¶ 4.  Bolle worked in several positions during his time at Hershey,

19  including District Account Supervisor, Category Development Manager (CDM), and

20  Manager of Category Development (MCD).  Id. ¶¶ 7-8, 10.  In August 2008, Bolle was

21  placed on a 90-day performance improvement plan.  Id. ¶ 12.  A 90-day extension of that

22  performance improvement plan followed.  Id. ¶ 13.  Hershey transferred Bolle to a CDM

23  position, a demotion, id. ¶ 16; Answer ¶ 54, and then terminated him in September 2010, id.

24  ¶ 18.

25       Bolle signed a separation agreement with Hershey on October 7, 2010.  Bolle

26  Separation Agreement (dkt. 48) Ex. 2.  In November 2011, Bolle filed charges of

27  discrimination with the Pennsylvania Human Relations Commission, Colorado Civil Rights

28

2

1   Division, and the EEOC, which alleged that "the severance agreement is not valid."  Bolle

2   Charge of Discrimination (dkt. 48) Ex. 4.

3          Wasson

4          Wasson joined Hershey in 1991 and worked there until her termination in May 2010.

5   Answer ¶¶ 60, 75.  While at Hershey, Wasson worked as a Customer Sales Executive.

6   Wasson Decl. (dkt. 52) Ex. D ¶ 4.  After Hershey terminated Wasson, she signed a separation

7   agreement in June 2010.  Wasson Severance Agreement (dkt. 48) Ex. 1.  Later, Wasson filed

8   a charge of discrimination with the Pennsylvania Human Relations Commission, Tennessee

9   Human Rights Commission, and the EEOC in February 2011.  Wasson Charge of

10  Discrimination (dkt. 52) Ex. H.

11         Following Plaintiffs' Complaint and Defendant's Answer, the parties had an initial

12  case management conference on August 24, 2012.  Mins. (dkt. 46).  Defendant filed this

13  motion for partial summary judgment on September 7, 2012, shortly after discovery

14  commenced.

15  **II.    LEGAL STANDARD**

16         A principal purpose of the summary judgment procedure is to isolate and dispose of

17  factually unsupported claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The

18  party moving for summary judgment has the burden to show initially the absence of a

19  genuine issue concerning any material fact.  See Adickes v. S.H. Kress & Co., 398 U.S. 144,

20  159 (1970).  Once the moving party has met its initial burden, the burden shifts to the

21  nonmoving party to establish the existence of an element essential to that party's case, and on

22  which that party will bear the burden of proof at trial.  See Celotex, 477 U.S. at 323-24.  To

23  discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must

24  have evidence showing that there is a genuine issue for trial.  See id. at 324.

25         Special rules of construction apply to evaluating summary judgment motions: (1) all

26  reasonable doubts as to the existence of genuine issues of material fact should be resolved

27  against the moving party; and (2) all inferences to be drawn from the underlying facts must

28  be viewed in the light most favorable to the nonmoving party.  T.W. Elec. Serv., Inc. v. Pac.

**United States District Court**
For the Northern District of California

3

1  Elec. Contractors Ass'n., 809 F.2d 626, 630-31 (9th Cir. 1987).  Further, admissions in an

2  opposing party's pleadings are admissible evidence and can serve as a basis for summary

3  judgment.  Lockwood v. Wolf Corp., 629 F.2d 603, 611 (9th Cir. 1980).

4  **III.     DISCUSSION**

5         **A.     Release Agreements of Bolle and Wasson**

6         In a dispute over the validity of a waiver, the Older Workers Benefit Protection Act

7  ("OWBPA") requires that "the party asserting the validity . . . shall have the burden of

8  proving . . . that a waiver was knowing and voluntary."  29 U.S.C. § 626(f)(3).  To be

9  knowing and voluntary, a waiver must conform to the OWBPA's statutory requirements.[1]

10  Oubre v. Entergy Operations, Inc., 522 U.S. 422, 426-27 (1998).  The requirement disputed

11  here is whether Hershey was required to give Plaintiffs 21 days or 45 days to consider the

12  agreement before signing it.  See 29 U.S.C. § 626(f)(1)(F).

13        Employers must provide 45 days notice when the waiver is "in connection with an

14  exit incentive or other employment termination program offered to a group or class of

15  employees."  29 U.S.C. § 626(f)(1)(F).  Additionally, if the waiver was "in connection with

16  an exit incentive or other employment termination program," employers must provide other

17  information about the individuals who are part of the group.  Id. § 626(f)(1)(H).  It is

18  undisputed that Hershey gave Bolle and Wasson less than 45 days to sign the agreements,

19  and did not provide any information about other people terminated.  Mot. at Ex. 1 ¶ 14, Ex. 2

20  ¶ 14 (clause allowing twenty-one days within which to consider the agreement).

21        There is no clear definition of what constitutes "an exit incentive or other employment

22  termination program" under  29 U.S.C. § 626(f)(1)(H).  Thiessen v. GE Capital Corp., 232 F.

23  Supp. 2d 1230, 1240 (D. Kan. 2002) ("The statute itself does not define 'exit incentive' or

24

25        [1]OWBPA's statutory requirements are: (1) the waiver is written to be understood by the
individual signing; (2) the waiver specifically references claims under the act; (3) the individual does
not waive rights arising after the date of execution; (4) the individual receives consideration in addition
26  to what he/she is already entitled; (5) the individual is advised in writing to consult with an attorney
before executing the waiver; (6) the individual is given 21 days, or 45 days in connection with an exit
27  incentive or other employment termination program, to consider the agreement; (7) the agreement
provides a period of at least 7 days following execution of the agreement during which the agreement
28  may be revoked; and (8) additional information must be supplied if the waiver is in connection with an
exit incentive or other employment termination program.  29 U.S.C. § 626(f)(1).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

'employment termination program' and very few cases have analyzed the meaning of the phrases."). The legislative history of the OWBPA provides:

> Individual separation agreements are the result of actual or expected adverse action against an individual employee. The employee understands that action is being taken against him, and he may engage in arms-length negotiation to resolve any differences with the employer.
>
> Group termination and reduction programs stand in stark contrast to the individual separation. During the past decade [the 1980s], in particular, employers faced with the need to reduce workforce size have resorted to standardized programs designed to effectuate quick and wholesale reductions. The trademark of involuntary termination programs is a standardized formula or package of employee benefits that is available to more than one employee. The trademark of voluntary reduction programs is a standardized formula or package of benefits designed to induce employees voluntarily to sever their employment. In both cases, the terms of the programs generally are not subject to negotiation between the parties. In addition, employees affected by these programs have little or no basis to suspect that action is being taken based on their individual characteristics. Indeed, the employer generally advises them that the termination is <u>not</u> a function of their individual status. Under these circumstances, the need for adequate information and access to advice before waivers are signed is especially acute.

S. Rep. No. 101-263, at 32 (1990).

Further, EEOC regulations indicate that whether a program exists is a question of fact that should be determined on a case by case basis.

> [T]he existence of a "program" will be decided based upon the facts and circumstances of each case. A "program" exists when an employer offers additional consideration for the signing of a waiver pursuant to an exit incentive or other employment termination (e.g., a reduction in force) to two or more employees. Typically, an involuntary termination program is a standardized formula or package of benefits that is available to two or more employees, while an exit incentive program typically is a standardized formula or package of benefits designed to induce employees to sever their employment voluntarily. In both cases, the terms of the programs generally are not subject to negotiation between the parties.

Waivers of Rights and Claims under the ADEA, 29 C.F.R. § 1625.22(f)(1)(iii)(B).

EEOC's regulations also note that termination program can be phased and take place over time:

> An involuntary termination program in a decisional unit may take place in successive increments over a period of time. Special rules apply to this situation. Specifically, information supplied with regard to the involuntary termination program should be cumulative, so that later terminees are provided ages and job titles or job categories, as appropriate, for all persons in the decisional unit at the beginning of the program and all persons terminated to date. There is no duty to supplement the information given to earlier terminees so long as the disclosure, at the time it is given, conforms to the requirements of this section.

United States District Court
For the Northern District of California

1  29 C.F.R. § 1625.22(f)(4)(vi).

2          Little in the record indicates whether the benefits offered to the parties were

3  standardized or whether the terms of the separation agreements were negotiated between the

4  parties.  Hershey provides evidence of a letter from Wasson's attorney to Hershey, which

5  indicates an attempt to negotiate.  Mot. at Ex. 3.  But, the severance payment Wasson

6  received was the payment initially offered to her, indicating that Wasson's attempts to

7  negotiate were unsuccessful.  Id. at 2, Ex. 3.  The burden is on Hershey to establish that the

8  waiver is valid, and it has not adequately developed the record regarding the standardization

9  and negotiation between the parties.

10          Plaintiffs allege that they were fired for reasons unrelated to performance, while

11  Defendant claims that all Plaintiffs were fired for substandard performance.  Opp'n at 5-6;

12  Mot. at 2.  This is a dispute as to facts, and few facts are currently in the record.  Discovery

13  began only two weeks before this motion was filed[2] and, to date, the Court is unaware of any

14  response to Plaintiffs' requests for production, which included "[a]ll DOCUMENTS

15  concerning ANY plans or goals to sever CSEs or CDMs in 2009 through 2011 or ANY other

16  termination program or plan to severe [sic] CSEs and CDMs in 2009 through 2011" and

17  requests for documents related to Plaintiffs' records and Defendant's alleged "age blocking."

18  Opp'n at Ex. I.

19          At oral argument, Plaintiffs argued that the Court should grant summary judgment

20  despite the dearth of facts in the record because the alleged "age blocking," even if proved,

21  would still be distinguishable from a traditional reduction-in-force program, and so would

22  not qualify under the statute.  The legislative history indicates that large-scale reductions in

23  force do qualify as employment termination programs, S. Rep. No. 101-263, at 32 (1990), but

24  the language of the statute and of the corresponding regulations permit a broader reading.

25  The Court needs more facts surrounding these terminations before making a determination as

26  to whether an exit incentive or other termination program existed.

27  ───────────────

28          [2]Defendant argues that Plaintiff did not properly comply with Rule 56(d), which requires an
   affidavit or declaration to present facts it needs in asking for a delay in further discovery; however,
   Plaintiffs' Declaration of Brian J. Malloy did just that.  Opp'n Ex. A ¶¶ 11-14.

1    Accordingly, the Court DENIES the motion for summary judgment as to the ADEA

2  claims.

3          **B.          Failure to Exhaust Administrative Remedies of Barnes and Bolle**

4          In order to properly bring an action based on the California Fair Employment and

5  Housing Act ("FEHA"), a plaintiff must first exhaust administrative remedies.  Romano v.

6  Rockwell Int'l Inc., 14 Cal. 4th 479, 492 (1996).  A plaintiff exhausts administrative remedies

7  by filing a complaint with the California Department of Fair Employment and Housing

8  ("DFEH") within one year of the occurrence of the alleged conduct, and the DFEH then

9  provides what is commonly referred to as a "right to sue" letter.  See Cal. Gov't Code

10  § 12960(b) & (d); id. § 12965(b).

11          Plaintiffs argue that Barnes exhausted his administrative remedies because the DFEH

12  and the EEOC have a work-sharing agreement whereby complaints filed with the EEOC are

13  automatically filed with the DFEH, and Barnes filed with the EEOC.  Opp'n at 20.  Hershey

14  responds that because Barnes' EEOC Charge of Discrimination directed cross-filing with the

15  state agencies in Texas and Pennsylvania–but not California–Barnes demonstrated that he did

16  not intend to file with the DFEH in California and, consequently, his administrative remedies

17  were not exhausted for purposes of FEHA.  Reply at 11-12.

18          It is true that EEOC and DFEH have a work-sharing agreement such that each has

19  designated the other as its "agent for receiving charges and agreed to forward to the other

20  agency copies of all charges potentially covered by the other agency's statute."  Downs v.

21  Dept. of Water & Power, 58 Cal. App. 4th 1093, 1097 (1997).  Regulations provide, and

22  courts have held, that filing a complaint with the DFEH is sufficient to provide notice to the

23  EEOC.  29 C.F.R. § 1626.10(c); Reed v. UBS Secs., LLC, No. C 09-5237 MHP, 2010 WL

24  3119200, at *6 (N.D. Cal. Aug. 3, 2010).  But, the question here is whether Barnes' filing

25  with the EEOC satisfied FEHA's administrative exhaustion requirement.

26          California courts have held that for an employee to assert FEHA claims, the employee

27  must bring her charges to the DFEH in some manner.  For example, in Martin v. Lockheed

28  Missiles & Space Co., the court held that

United States District Court
For the Northern District of California

7

1   [a]bsent any showing that [the employee] filed her amended charge, or caused
2   it to be filed, with the DFEH, or that the DFEH had actual notice of the
    amended charge from any other source, there is no basis for an assertion that
3   [the employee] could predicate her lawsuit on the DFEH's inaction (in lieu of
    better evidence that she had exhausted her administrative remedies).

4   29 Cal. App. 4th 1718, 1727 (Ct. App. 1994); see also id. at 1729-30 ("If [the employee]

5   wished to avail herself of state judicial remedies for her . . . claims, it was essential that she

6   undertake by reasonable means to make the . . . claims known to the DFEH."); see also

7   Alberti v. City & Council of S.F. Sheriff's Dept., 32 F. Supp. 2d 1164, 1174 (N.D. Cal. Nov.

8   25, 1998).

9          Here, Barnes' Charge of Discrimination specifically lists state agencies in

10  Pennsylvania and Texas, as well as the EEOC, in the section of the Charge of Discrimination

11  form asking the person filing the charge to list the "State or local Agency, if any."  Mot. at

12  Ex. 5.  Plaintiffs do not claim the DFEH ever communicated with them about their claims, as

13  occurred in cases cited by Plaintiffs.  Salgado v. Atlantic Richfield Co., 823 F.2d 1322, 1323

14  (9th Cir. 1987) (stating that Salgado received a "right-to-sue" letter from DFEH eleven days

15  after the complaint was filed with the EEOC); Downs, 58 Cal. App. 4th at 1097 (stating that

16  Plaintiff received a letter from DFEH acknowledging that the claim had been filed with the

17  state).

18         Further, in the only case Plaintiffs cite where a court found exhaustion after the

19  employee filed with the EEOC but did not receive any communication from the DFEH, the

20  court noted that the "State or local agency" field was left blank but the charge itself said that

21  the employee lived in California and wanted to file "with both the EEOC and the State or

22  local Agency."  Reed, 2010 WL 3119200, at *2-3, 8 (N.D. Cal. Aug. 3, 2010).

23         Assuming Reed was correct, this case is different: Barnes' charge only referenced

24  California in noting that Barnes had turned down a position in California.  Mot. at Ex. 5.

25  But, Barnes specifically indicated that the charge should be filed with the Pennsylvania

26  Human Relations Commission and the Texas Workforce Commission Civil Rights Division,

27  and Barnes provided a home address in Texas and his employer's address in Pennsylvania.

28

**United States District Court**
For the Northern District of California

Nothing in the EEOC Charge of Discrimination suggested that the EEOC charge should have been cross-filed with the DFEH.

As for the policy rationales underlying administrative exhaustion,

> [t]he exhaustion requirement serves the important policy interests embodied in the act of resolving disputes and eliminating unlawful employment practices by conciliation [], as well as the salutory goals of easing the burden on the court system, maximizing the use of administrative agency expertise and capability to order and monitor corrective measures, and providing a more economical and less formal means of resolving the dispute.

Rojo v. Kliger, 52 Cal. 3d 65, 83 (1990). Arguably, a filing with the EEOC addresses these rationales–but so would a filing with any state agency or administrative body around the country, and the California case law cited above suggests that California does not take the position that any administrative review will do. Instead, California requires that its own administrative body receive and review the charge (or at the very least have had good reason to do so based on administrative filings with a cooperating entity) before an aggrieved employee can bring suit.

Barnes failed to exhaust his administrative remedies, and Hershey's motion for partial summary judgment on his FEHA claim is GRANTED.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES the motion for partial summary judgment on Bolle's and Wasson's ADEA claims until the record is more developed as to whether a group termination plan existed, and GRANTS the motion for partial summary judgment on Barnes' FEHA claim based on his failure to exhaust administrative remedies.

**IT IS SO ORDERED.**

Dated: November 5, 2012

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE