1
2
3
4
5
6
7
8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   GREGORY P. BARNES, ET AL.,                    No. 3:12-cv-01334-CRB

12          Plaintiffs,                            **ORDER DENYING PLAINTIFFS'**
                                                   **MOTION FOR SUMMARY JUDGMENT**
13      v.                                         **AND GRANTING IN PART AND**
                                                   **DENYING IN PART DEFENDANT'S**
14   THE HERSHEY COMPANY,                          **MOTION FOR SUMMARY JUDGMENT**

15          Defendant.
                                         /
16

17          At the time of their separation from Hershey, the Plaintiffs that are part of the instant

18   motions for summary judgment signed a waiver of their age discrimination claims in

19   exchange for a severance payment.  The Older Workers Benefit Protection Act ("OWBPA"),

20   29 U.S.C. § 626 et seq., allows such waivers only if the employer strictly complies with

21   various statutory requirements, which include a longer waiting period and increased

22   disclosure requirements if a waiver is executed in connection with a group termination

23   program instead of an individual termination.  It is undisputed that the waivers at issue here

24   complied with the statutory requirements for an individual termination.  But Plaintiffs allege

25   that their waivers are invalid because they were actually terminated as part of an undisclosed

26   group termination.  Both parties now seek summary judgment in their favor on the issue

27   whether the waiver that each Plaintiff signed is valid.[1]

28
     _____

          [1]   See Hershey's Motion for Partial Summary Judgment (dkt. 229); Plaintiffs' Opposition (dkt.
     242); Hershey Reply (dkt. 254); see also Plaintiffs' Motion for Partial summary Judgment on
     Defendant's Affirmative Defense of Waiver (dkt. 236); Hershey's Opposition (dkt. 250); Plaintiffs'

1    Because the terminations at issue here meet almost none of the factors of a group

2    termination, as explained implicitly in the Court's rulings and reasoning with respect to

3    Hershey's cross motion, Plaintiffs' motion for summary judgment in their favor is DENIED.

4    As for Hershey's motion for summary judgment, Plaintiffs Mary Frazier, Richard Nelson,

5    Lori DeLaRue, Mary Wasson, and Mary Weeks unquestionably were terminated on an

6    individual basis, not as part of a group.  Thus, they validly waived any age discrimination

7    claims, and Hershey's motion for summary judgment as to these Plaintiffs is hereby

8    GRANTED.  Plaintiff David Bolle is situated differently, in that the evidence could support a

9    reasonable finding that he was terminated in connection with a separate and unrelated

10   restructuring of the West Grocery group.  Thus, there exists a material question of fact

11   whether Bolle's individual waiver is invalid, and Hershey's motion for summary judgment as

12   to him is DENIED.  The only Plaintiff to have been terminated via a group termination and

13   group waiver was James Bombeck, who now argues that the waiver he signed is invalidated

14   by misstatements in its required disclosures.  Because Hershey has shown as a matter of law

15   that this waiver is valid, Hershey's motion for summary judgment is GRANTED as to

16   Bombeck.

## I.    BACKGROUND

18       In the light most favorable to the Plaintiffs, the evidence in the record shows the

19   following.[2]

### A.    Hershey Employment Backdrop

21       Hershey's domestic Sales Department is made up of a Retail division and a Category

22   and Customer division.  Magnuson Depo. (Ex. 9)[3] at 14–15.  Plaintiffs were Customer Sales

23   Executives (CSE) and Category Development Managers (CDM), which are Category and

_____

25   Reply (dkt. 261).

26      [2]  The Court having already considered and easily rejected Plaintiffs' Motion for Summary
Judgment, the facts are considered in the light most favorable to Plaintiffs as the non-moving party for
27   the purpose of evaluating Hershey's Motion for Summary Judgment.

28      [3]Unless otherwise noted, all exhibit numbers refer to Exhibits to the Declaration of Brian J.
Malloy in Support of Plaintiffs' Motion for Partial Summary Judgment (dkt. 237).

1   Customer division management positions in pay grades 206 to 213, although Plaintiffs were

2   in pay grades 206–210.  See Data Disks (Ex. 46 and 47).  Hershey employees in these

3   positions manage from one to six clients and are responsible for developing client

4   relationships through direct interaction with their accounts and creating and communicating

5   sales plans.  Burkett Depo. (Ex. 8) at 33–35.

6          Tom Smuda, Vice-President of the Retail division, made a presentation on June 23,

7   2009, to a group of Sales department executives known as the Sales Leadership Team.

8   Ibberson Depo. (Exh. 93) at 8–9; Hershey's Response to Plaintiffs' Amended Request for

9   Admissions (Ex. 44) Nos. 1–2.  The presentation included a series of PowerPoint slides,

10  entitled "The Who?," which outlined a wide variety of workforce management challenges,

11  objectives, and suggestions.  See The Who? Presentation (Ex. 50).  Among many other

12  points, the presentation reminded managers that "certain roles are developmental or pass

13  through roles and not intended for someone to remain in place for an extended period of

14  time."  Id. at 5.  The presentation discussed ways in which managers can identify talented

15  employees as well as help their teams gain the experiences and skills they need to move into

16  higher-level positions.  See generally id.  Hershey was facing difficulty getting qualified

17  employees to apply to higher-level management positions, in part because some employees

18  lacked key career experiences and many were reluctant to relocate, which coupled with a

19  limited number of entry-level 206/207 grade CSE positions due to prior reorganization and

20  headcount reductions.  Id. at 2.  The presentation proposed that these challenges could be

21  addressed through a range of options, including mentoring, talent development workshops,

22  increasing the client-facing opportunities available to high-potential employees, and

23  "[e]stablish[ing] a term limits program for 206–209/210 positions."  Id. at 7–9.  There is no

24  evidence that a term limits program was actually implemented.

25         Two days later, Robert Ibberson, an executive who reported to Smuda, circulated an

26  email to representatives of various business segments within Hershey about a career planning

27  project.  See Ibberson Depo. (Ex. 93) at 10, 64–76; June 25 Email (Exh. 51).  The email

28  listed, among other "follow-up" items, that "Steve[n Wojcik] will investigate certain salary

3

United States District Court
For the Northern District of California

1   grades by organization, and average tenure by grade/organization" and "will communicate

2   some career and performance management BDPs and processes." <u>See</u> June 25 Email. The

3   email also scheduled two conference calls for June and July, and Ibberson asked the team

4   members to review Smuda's PowerPoint slides "The Who?" ahead of an in-person meeting

5   in July. <u>Id.</u>; July 10 Email (Ex. 53).

6         The following month, in August 2009, Ibberson gave a presentation to the Sales

7   Leadership Team. Ibberson Decl. (Ex. 93) at 111–12. Slides for the presentation, entitled

8   "The Career Pathing Project," stated among other things that the goal was to "further develop

9   and enhance people strategies for the sales department;" that the team had been "tasked to

10  explore ways to better meet our people needs;" that "cultural, economic and generational

11  trends have limited mobility of employees, resulting in a need for creative solutions;" and

12  that current processes were failing to "develop necessary skills to enable employees to

13  advance within the organization," such that the existing candidate pool lacked the skills

14  needed for higher level positions. Presentation Slides (Ex. 55) at 3–5. The presentation

15  suggested that Hershey "[u]pdate [the] Career Development Action Plan[, i]ncluding career

16  path timeline, training history, awards and recognition," and that these be "[i]ntegrated into

17  ongoing performance and feedback discussion," along with suggesting the creation of an

18  interactive career website and mentoring program. <u>Id.</u> at 7. The presentation called for

19  greater communication and accountability, including "[c]lear and measurable expectations

20  commiserate [sic] with time in role," and that managers should "[c]larify[] time in role

21  expectations" through a "sliding scale of job expectations reflecting time in role" with a

22  detailed list of qualities that reflected each level of performance. <u>Id.</u> at 14–16. One slide

23  stated "Restructure account assignments to allow for more entry level account management

24  positions to enhance the pipeline of talent," and another listed the raw numbers of employees

25  in each paygrade broken down by the amount of time in their current role. <u>Id.</u> at 24–25. The

26  presentation then proposed several "Big Ideas," including a time limit at each paygrade from

27  206 to "213+" (at the end of which the position would be reposted), along with field office

28  hubs, internships, and development tools. <u>Id.</u> at 28–32. Updated presentations on the

**United States District Court**
For the Northern District of California

"Career Planning Project" in November and December 2009 reiterated a focus on "career timelines and greater emphasis on developmental activities," improved mentoring programs and website resources, and enhanced feedback channels for employees. See Nov. 2009 Slides (Ex. 63 at 4–5); Dec. 2009 Slides (Ex. 64) at 2–5.

This preparation led up to a Sales department Career Planning Meeting on January 26–28, 2010, which approximately fifty Sales Department executives attended. See, e.g., Email (Ex. 69); Zerphy Decl. (Ex. 94) at 147. Ahead of the meeting, each supervisor was instructed to evaluate each of his or her direct reports across a number of dimensions, including time in role, annual performance ratings for the previous two years, a "Talent Indicator" that reflected that employee's "promotability" or ability to take on more advanced roles, what those possible future roles might be, and developmental activities. See Jan. 19 Email (Ex. 70) at 3; Slides (Ex. 72) at 15. "Talent Indicator" definitions explained that a ranking of 5 meant the employee had the ability to move up two levels in the company within 3–5 years; a ranking of 4 meant the employee had the ability to move up one level in that time frame; a ranking of 3 meant the employee had high potential but was unable to advance due to external factors, such as relocation limitations; a ranking of 2 meant the employee was an expert in his or her current role but did not have the potential to advance; and a ranking of 1 meant the employee was developing or unsuccessful. See, e.g., Presentation (Ex. 74) at Appendix.

By the end of the first day of the meeting, each attendee was told to submit to Human Resources a "Team Scorecard," which were compiled and loaded onto a presentation template for the next day's meeting. This 'Team Scorecard" was a one-page roster for each supervisor that listed, for each employee that reported to that supervisor, the employee's 2009 performance rating, time in role, the aforementioned "Talent Indicator," and new hires and turnover for the team. See, e.g., Presentation (Ex. 74) at 5. Separate slides listed this same information by total numbers (rather than individual names) for divisions as a whole. See, e.g., id. at 7. These evaluations were not limited to CSEs and CDMs in pay grades 206–210, but rather extended to a variety of positions, pay grades, and regions. See, e.g., id.

5

at 7, 10.  The Team Scorecards were loaded onto an overhead projector, and each supervisor presented to the attendees about "their talent" and "their development strategies as far as high potentials."  Ibberson Decl. (Ex. 93) at 155.  Although promotions of "high potential" employees were discussed extensively, there is no evidence of any discussion or decisions regarding employee terminations.  See, e.g., Presentation (Ex. 74); Ibberson Decl. (Ex. 93) at 155; Response to RFA (Ex. 44) No. 43.

**B.      Terminations and Releases**

It is undisputed that Frazier, Nelson, DeLaRue, Wasson, Weeks, and Bolle received and signed releases that complied with the OWBPA's requirement for individual terminations.  These Plaintiffs argue that the releases they signed are invalid because they allege that their terminations were part of a single group termination with the January 2010 Career Planning Meeting at its epicenter.

1.      Mary Frazier

Mary Frazier was a CSE at pay grade 206 who had worked at Hershey since 1989 and as of January 2010 was age 45.  See Data Disks (Exs. 46 and 47).  She worked in the Convenience Store line of business in Cleveland and at all relevant times reported to Otis Smith.  See Frazier Tr. (Brigham Decl., Dkt. 230, Ex. 5) at 8, 138.  Frazier's salary records reflect an appraisal of "Effective" for 2007, "Effective" for 2008, "On Target" for 2009, and "Developing" for 2010.  See Frazier Work Event Profile (Ex. 88).  Hershey first placed Frazier on a Performance Improvement Plan in January 2007, which included a note that Frazier was "Effective" and that the improvement plan was targeted to address specific account issues.  See PIP 01/09/07 (Dkt. 151-14).  Frazier was again placed on a Performance Improvement Plan in October 2007, via a letter that detailed specific customer complaints against Frazier and that internal feedback ranked Frazier as being "at the bottom" compared to other CSEs.  See PIP 10/22/07 (Dkt. 151-15).  Frazier was placed on a Performance Improvement Plan yet again in September 2009, via a letter that stated her current rating was "Developing," detailed persistent client and internal complaints against her, and explained that she ranked "at the bottom of the entire C store depth chart."  See PIP 09/28/09 (Dkt.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   151-16).  The letter also explained that if the listed deficiencies remained unaddressed, they

2   could lead to Frazier's termination.  See id.  At the aforementioned Career Planning Meeting

3   in January 2010, Frazier was listed as having a 2009 Performance Rating of "Developing," a

4   time in role of 6+ years, and the lowest possible "Talent Indicator" of 1, meaning

5   "Developing/Unsuccessful."  See Presentation (Ex. 74) at 27.  In March 2010, Hershey

6   extended Frazier's Performance Improvement Plan in a letter that stated that her personal and

7   family matters had interrupted the prior plan, that her current performance rating was

8   "Unsatisfactory," that customers had leveled specific and recurring complaints against her,

9   and that internal feedback continued to rank her at the bottom of other CSEs.  See PIP

10  03/08/10 (Dkt. 151-17).  The Plan extended to May 7, 2010, and explained that unsuccessful

11  completion of the detailed areas of improvement would result in the termination of her

12  employment.  Id.

13      At the completion of the final Performance Improvement Plan, Smith made the

14  decision to terminate Frazier.  See Smith Decl. (dkt. 154) at ¶ 11.  Hershey presented Frazier

15  with a Release on May 6, 2010, which she executed on May 18 and did not revoke thereafter.

16  See Frazier Release (dkt. 151-5).  Frazier came to believe that Hershey was discriminating

17  against her based on age as early as January 2010.  Frazier Tr. (Brigham Decl., Dkt. 230, Ex.

18  5) at 40–41.  She understood that in order to receive a severance package she needed to sign

19  a release that specifically released age discrimination claims.  Id. at 119–120.  She chose to

20  sign the release, despite believing that Hershey was discriminating against her, and she

21  received $26,979.59 in severance.  Id. at 40–41; Frazier Release (dkt. 151-5).

22      Smith did not supervise any of the other Plaintiffs at the times of their terminations.

23  Smith Decl. (dkt. 154) at ¶ 18.  Hershey filled Frazier's position after her termination.  See

24  Revised Ex. A to Hershey's 10/6/14 Supplemental Interrogatory Responses (Brigham Decl.,

25  Dkt. 230, Ex. 7).

26          2.      Richard Nelson

27      Richard Nelson was a CSE at pay grade 208 who had worked at Hershey since 1988

28  and as of January 2010 was age 51.  See Data Disks (Ex. 46 and 47).  He worked in the

United States District Court
For the Northern District of California

1    Grocery line of business in New Hampshire and at the time of his termination reported to Sec

2    Briselli, who was a member of the Career Planning Project team.  See Nelson Tr. (Brigham

3    Decl., Dkt. 230, Ex. 3) at 8–10.  Hershey placed Nelson on a Development Plan in

4    September 2008, which noted specific areas for improvement and dimensions on which

5    Nelson fell below the expected levels of performance.  See DP 09/02/08 (Dkt. 151-19).  In

6    March 2009, Nelson received his 2008 year-end performance rating, which stated he was

7    "On Target."  2008 Performance Management (Ex. 85).  Following complaints from various

8    managers about unaddressed problems from the 2008 Plan, Nelson was placed on a

9    Performance Improvement Plan in August 2009.  See Emails (Ex. 54); PIP 08/09/09 (Dkt.

10   151-20).  The letter accompanying the Plan stated that Nelson's performance rating was

11   "Unsuccessful," explained that the areas of improvement from the September Plan had not

12   been addressed and remained unsuccessful, and detailed specific financial and account

13   targets that had not been met.  See PIP 08/09/09 (Dkt. 151-20).  The letter also explained that

14   failure to address the issues outlined in the letter could result in termination.  Id.

15          Briselli terminated Nelson on November 12, 2009, which was two days after the

16   completion of the time limit outlined in the Plan and four days before Briselli's November

17   Career Planning Project presentation.  See Nelson Termination (dkt. 151-18).  Nelson

18   executed a Release of his age discrimination claims on November 28, 2009, and did not

19   revoke it.  Nelson Tr. (Brigham Decl., Dkt. 230, Ex. 3) at 69–70.  Nelson believed that his

20   termination was part of a larger program to terminate older workers.  See Nelson Response

21   (dkt. 151-21).  He understood that by signing the release he was waiving any age

22   discrimination claims.  See Nelson Tr. (Brigham Decl., Dkt. 230, Ex. 3) at 68.  In fact,

23   Nelson consulted an attorney before signing the Release and tried to negotiate it by asking

24   Hershey to remove the age discrimination waiver, which Hershey declined to do.  Id. at

25   65–70.  Nelson received $29,130.76 in severance.  Nelson Release (dkt. 151-6).

26          Briselli did not supervise any of the other Plaintiffs at the times of their terminations.

27   Briselli Decl. (dkt. 152) at ¶ 12.  Nelson's Notice of Termination informed him he was

28   terminated for having failed to maintain a satisfactory level of performance despite his

8

1   participation in a Performance Improvement Plan.  Nelson Termination (dkt. 151-18).  At the

2   January 2010 Career Planning Meeting, Nelson presumably is one of the two "non-

3   regrettable turnover" terminations listed on Briselli's report, meaning that Nelson would

4   have received a Talent Indicator of 1 or 2, which represented "Developing/Unsuccessful" or

5   "Unable to Advance."  Presentation (Ex. 74) at 19, Appendix.  Hershey filled Nelson's

6   position after his termination.  See Revised Ex. A to Hershey's 10/6/14 Supplemental

7   Interrogatory Responses (Brigham Decl., Dkt. 230, Ex. 7).

8              3.      Lori DeLaRue

9         Lori DeLaRue was a CSE at pay grade 208 who had worked at Hershey since 1999

10   and as of January 2010 was age 48.  See Data Disks (Ex. 46 and 47).  She was part of the

11   Convenience Store division in the Phoenix/Albuquerque market and reported to Jon Davis,

12   who became her supervisor in 2009.  DeLaRue Tr. (Brigham Decl., Dkt. 230, Ex. 4) at 9–10.

13   At the January 2010 Career Planning meeting, DeLaRue was rated as having a 2009

14   Performance Rating of "Successful," a time in role of 6+ years, and the lowest possible

15   "Talent Indicator" of 1, meaning her ability to move into higher level roles was

16   "Developing/Unsuccessful."  See Presentation (Ex. 74) at 30, Appendix.  On April 20, 2010,

17   Davis put DeLaRue on a Development Plan, via a letter that stated her performance rating

18   was "Developing" and detailed deficient areas of performance and metrics for improvement.

19   See Development Letter 4/20/10 (Ex. 80).

20         After the completion of the Development Plan period, Hershey terminated DeLaRue

21   on July 21, 2010.  DeLaRue Severance (dkt. 151-4) at 1.  DeLaRue believed as early as April

22   2010, and certainly at the time of signing her Release of any age discrimination claims, that

23   Hershey targeted her because of her age.  DeLaRue Responses to Interrogatories, Set One

24   (dkt. 151-25); DeLaRue Tr. (Brigham Decl., Dkt. 230, Ex. 4) at 58–60.  She understood that

25   in order to receive a severance package she needed to sign a release that specifically released

26   age discrimination claims, and consulted an attorney before signing the Release.  DeLaRue

27   Tr. (Brigham Decl., Dkt. 230, Ex. 4) at 63–65.  DeLaRue received $15,110.92 in severance.

28   DeLaRue Release (dkt. 151-4).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Davis did not supervise any of the other Plaintiffs at the times of their terminations.

2    Davis Decl. (dkt. 153) at ¶ 12.  DeLaRue's Notice of Termination informed her that she was

3    being terminated for maintaining an unsatisfactory level of performance despite being placed

4    on a Performance Improvement Plan.  DeLaRue Termination (dkt. 151-24).  Hershey filled

5    DeLaRue's position after her termination.  See Revised Ex. A to Hershey's 10/6/14

6    Supplemental Interrogatory Responses (Brigham Decl., Dkt. 230, Ex. 7).

7            4.      Mary Wasson

8            Mary Wasson was a CSE at pay grade 209 who had worked at Hershey since 1987

9    and as of January 2010 was age 41.  See Data Disks (Ex. 46 and 47).  She was part of the

10   Southeast Grocery division in Mississippi and reported to Tim Ciriacks.  Wasson Tr.

11   (Brigham Decl., Dkt. 230, Ex. 2) at 9; Ciriacks Decl. (Ex. 27-5) ¶ 2.  A "2009 Performance

12   Calibration" listed Wasson's "overall rating" as "Successful" (see Performance Calibration,

13   Ex. 86), but her rating was later downgraded.  On January 13, 2010, Ciriacks placed Wasson

14   on a Development Plan via a letter that stated it was a "followup to a review of [her]

15   performance" and outlined specific areas needing improvement.  See Wasson Development

16   01/13/10 (dkt. 151-26).  Shortly thereafter at the January 2010 Career Planning Meeting,

17   Wasson was listed as having a 2009 Performance Rating of "Developing," a time in role of

18   6+ years, and a "Talent Indicator" of 1, meaning "Developing/Unsuccessful" abilities for

19   promotion.  See Presentation (dkt. 74) at 21.

20          On April 8, 2010, Ciriacks placed Wasson on an "Improvement Plan" that stated her

21   current performance rating was "Unsatisfactory" and listed specific areas of substandard

22   performance and metrics for improvement.  See Wasson Improvement Plan 04/08/10 (dkt.

23   151-27).  Subsequently, other managers documented her "lack of engagement," high error

24   rate despite her long tenure in her role, and other gaps in performance, and recommended

25   that she be terminated.  See Email 05/12/10 (Ex. 23).  Following the April Improvement

26   Plan, Wasson requested a severance package from Ciriacks.  See Email 05/12/10 (Ex. 23).

27          Hershey terminated Wasson on May 28, 2010.  Wasson Severance (dkt. 151-7) at 1.

28   Wasson believed as early as March or April 2010 that Hershey was discriminating against

**United States District Court**
For the Northern District of California

1   her because of her age.  Wasson Tr. (Brigham Decl., Dkt. 230, Ex. 2) at 30.  She understood

2   that by signing a Release she was waiving any age discrimination claims.  Wasson Tr. at 110.

3   In fact, she consulted an attorney before signing the Release and tried to negotiate her

4   severance payment, which Hershey declined.  Wasson Tr. (Brigham Decl., Dkt. 230, Ex. 2)

5   at 112; Dkt. 48-3.  Wasson received $32,904.20 in severance.  Wasson Release (dkt. 151-7).

6        Neither Ciriacks nor another manager who recommended Wasson's termination

7   supervised any of the other Plaintiffs at the times of their terminations.  Ciriacks Decl. (Ex.

8   27-5) at ¶ 12.  Hershey filled Wasson's position after her termination.  See Revised Ex. A to

9   Hershey's 10/6/14 Supplemental Interrogatory Responses (Brigham Decl., Dkt. 230, Ex. 7).

10            5.     Mary Weeks

11       Mary Weeks was a CSE at pay grade 207 who worked at Hershey since 1987 and as

12  of January 2010 was age 50.  See Data Disks (Ex. 46 and 47).  She was part of the

13  Convenience Store division in Tennessee and reported to Michael Hughes.  Weeks Tr.

14  (Brigham Decl., Dkt. 230, Ex. 8) at 17; 3/25/10 Email (dkt. 151-30).  Weeks's salary records

15  reflect an appraisal of "Effective" for 2008, "On Target" for 2009, and "Developing" for

16  2010.  See Weeks Work Event Profile (Ex. 90).  On December 23, 2009, Hughes had an

17  email conversation with his boss, Michael West, about putting Weeks on a Development

18  Plan.  Hughes Depo. (Ex. 102) at 85–87.  Hughes stated that Weeks's rating for that year

19  would be "Developing," and he discussed his thoughts for Weeks's Development Plan with

20  his supervisor and with Human Resources.  Id. at 88–90.  He also stated that he intended to

21  deliver the Plan to Weeks during a project in Memphis the week of January 4, 2010.  Id.

22       Shortly thereafter at the January 2010 Career Planning Meeting, Weeks was listed as

23  having a 2009 Performance Rating of "Developing," a time in role of 6+ years, and a "Talent

24  Indicator" of 1, meaning "Developing/Unsuccessful" abilities for promotion.  See

25  Presentation (dkt. 74) at 28.  On February 1, 2010, Hughes placed Weeks on a Development

26  Plan via a letter that stated her performance rating was "Developing" and outlined specific

27  areas needing improvement.  See Weeks Development Plan 02/01/10 (dkt. 151-31).

28  Subsequently, Weeks asked Hershey for a severance package.  Weeks Tr. (Brigham Decl.,

United States District Court
For the Northern District of California

1  Dkt. 230, Ex. 8) at 12.  It is unclear from the record whether Weeks's request for severance

2  benefits (which was granted) constituted a resignation or termination.  In any event, Weeks's

3  employment terminated on March 30, 2010.  See Weeks Severance (dkt. 151-8).  Weeks

4  understood that by signing a Release and accepting the severance benefits she was waiving

5  any age discrimination claims.  Weeks. Tr. (Brigham Decl., Dkt. 230, Ex. 8) at 47–49.

6  Although Weeks believed Hershey was going to terminate her based on age when she asked

7  for a severance package, Weeks signed the Release and received $28,215.95 in severance.

8  Weeks Tr. (Brigham Decl., Dkt. 230, Ex. 8) at 31; Weeks Severance (dkt. 151-8).  Hughes

9  did not supervise any of the other Plaintiffs at the times of their terminations.  Hughes Decl.

10  at ¶ 11.

11           6.     David Bolle

12        David Bolle was a CDM at pay grade 209 who had worked at Hershey since 1994 and

13  as of January 2010 was age 43.  (Ex. 46 and 47).  He was based in Colorado, and his

14  immediate manager was Shannon Syms.  Bolle Tr. 9–10; Dkt. 48-4.  Although an undated

15  "Performance Management Form" lists his overall rating as "Successful" (Ex. 26), in June

16  2009 Bolle accepted a demotion to the position of CDM from his previous role as a Manager

17  Category Development after being placed on two successive Performance Improvement

18  Plans that year.  See Bolle Decl. (Ex. 75) at ¶¶ 12–16.  A "Team Scorecard" like those

19  presented at the January 2010 Career Planning Meeting listed Bolle as having a 2009

20  Performance Rating of "Successful," a time in role of 1–3 years, and a Talent Indicator of 3,

21  which indicates a "high potential employee [who is] unable to advance due to external

22  factors, i.e. relocation" and whose separation is considered "regrettable turnover."  See

23  Scorecard (Ex. 91); Presentation (Ex. 74) at Appendix.  However, the Scorecard does not

24  appear within the Presentation from that meeting, so it unclear whether it was included or

25  discussed.  See Presentation (Ex. 74).  In March 2010, Bolle received a performance review

26  stating that his level of performance was effective.  See Bolle Decl. (Ex. 75) at ¶ 17.

27        Bolle was terminated in September 2010.  See Bolle Decl. (Ex. 75) at ¶ 18.  At the

28  time of his termination, Hershey cited the reason for termination as being Bolle's

United States District Court
For the Northern District of California

1   performance plans in early 2009, while he was in his prior role. See Bolle Decl. (Ex. 75) at ¶

2   18. But Bolle's termination roughly coincided with a restructuring of the West Grocery

3   Team, of which Bolle was a part. A PowerPoint presentation dated April 14, 2010, proposed

4   a restructuring of Vice-President Michael Weinstock's group, of which both Bolle and co-

5   Plaintiff Gregory Barnes (not a party to the instant motions) were both part. The presentation

6   explained the need to "adjust our structure to facilitate our mission" and proposed a new

7   structure that did not include Bolle or Gregory Barnes by name and stated that "West CDM

8   responsibility change necessitates posting positions." See Restructuring Presentation April

9   (Ex. 19) at Hershey 0009577 and 0009580. Approximately four months later, in August

10  2010, a set of PowerPoint slides captioned with the name of Bolle's and Gregory Barnes's

11  manager, Shannon Syms, proposed a series of options for restructuring the West Grocery

12  Team. See Restructuring Presentation Aug. (Ex. 39). The scenarios proposed relocating co-

13  Plaintiff Barnes and at least one removed Bolle from the structure entirely. See

14  Restructuring Presentation Aug. (Ex. 39). Bolle was then terminated the following month, in

15  September 2010. See Bolle Decl. (Ex. 75) at ¶ 18.

16          Bolle executed a Release despite his belief since 2009 that Hershey had discriminated

17  against him on the basis of age. See Bolle's Responses to Interrogatories, Set 1 (Dkt. 151-

18  33) at 7. He consulted an attorney before signing the Release and understood its terms. See

19  Bolle Tr. 70–75. Bolle received $35,740.80 in severance. Bolle Release (dkt. 151-2).

20                          7.      James Bombeck

21          James Bombeck was a CSE at pay grade 210 who had worked at Hershey since 1993

22  and as of January 2010 was age 60. See Data Disks (Exs. 46 and 47). Bombeck worked in

23  Hershey's Vend, Concession & Fundraising group in Pennsylvania and reported to Mark

24  Dieffenbach, who did not supervise any of the other Plaintiffs at the time of their

25  terminations. See Powerpoint (dkt. 151-34). Unlike all other Plaintiffs at issue in the instant

26  motion, Bombeck was terminated as part of a group termination program and signed a group

27  termination release. Specifically, Hershey presented Bombeck with a group termination

28  release on March 16, 2010, after it eliminated Bombeck's position in the course of a

1    restructuring that involved consolidating Bombeck's division with another to create a new

2    "Sales Speciality Channel Business Group." (Dkt. 151-34).  Two other employees were

3    selected for termination as part of the same restructuring; one of these was later terminated

4    along with Bombeck, and the other was offered a position after a sudden vacancy.  See

5    Dieffenbach Tr. (Brigham Decl., Dkt. 272, Ex. 2) at 113–15.   Bombeck signed the Release

6    on April 29, 2010, within the 45-day period he was given as per OWBPA's waiting period

7    for group terminations, and never revoked it.  See Bombeck Tr. (Brigham Decl., Dkt. 230,

8    Ex. 10) at 80.

9    **II.      LEGAL STANDARD**

10            The Court can grant a motion for summary judgment "if the movant shows that there

11   is no genuine dispute as to any material fact and the movant is entitled to judgment as a

12   matter of law." Fed. R. Civ. Proc. 56(a).  A principal purpose of summary judgment "is to

13   isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317,

14   323–24 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could

15   return a verdict" for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

16   A fact is material if it could affect the outcome of the suit under the governing law. Id. at

17   248–49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).

18   Moreover, if the evidence presented is "merely colorable" and not "significantly probative,"

19   the court may decide the legal issue and grant summary judgment. Id. at 249–50 (citations

20   omitted).  To determine whether a genuine dispute as to any material fact exists, the court

21   must view the evidence in the light most favorable to the non-moving party. Id. at 255.

22            In determining whether to grant or deny summary judgment, it is not a court's task "to

23   scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275,

24   1279 (9th Cir. 1996) (internal citation omitted).  Rather, a court is entitled to rely on the

25   nonmoving party to "identify with reasonable particularity the evidence that precludes

26   summary judgment." See id.

27   **III.     DISCUSSION**

28            The OWBPA "is designed to protect the rights and benefits of older workers." Oubre

United States District Court

For the Northern District of California

v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998).  Under that Act, an employee may only waive his or her rights under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, if the waiver is "knowing and voluntary."  29 U.S.C. § 626(f)(1).  For a waiver to be considered knowing and voluntary, it must at a minimum meet certain requirements.  29 U.S.C. § 626(f)(1).  All waivers must be "written in a manner calculated to be understood" by the employee, must "specifically refer[] to rights or claims arising under" the OWBPA, must not waive claims that arise after the waiver is executed, must be in "exchange for consideration in addition to anything of value to which the individual already is entitled," must advise the employee to consult an attorney, and must be revokable by the employee within 7 days.  29 U.S.C. § 626(f)(1).

But if the employee is terminated "in connection with an exit incentive or other employment termination program offered to a group or class of employees," additional requirements apply.  29 U.S.C. § 626(f)(1)(H)(i) (emphasis added).  Specifically, a valid waiver for an employee terminated under "an exit incentive or other employment termination program offered to a group or class of employees" must give the employee 45 days in which to consider the agreement, instead of the 21-day period that applies to individual waivers.  29 U.S.C. § 626(f)(1)(F).  It also must include disclosures as to the "class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program, and the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program."  29 U.S.C. § 626(f)(1)(H).

The Plaintiffs allege that rather than being terminated in a series of individual terminations, their terminations were actually connected by the January 2010 Career Planning Meeting that was the epicenter of a concerted effort to terminate long-tenured older workers on the basis of age discrimination.  "There's the respect that makes calamity of so

long life."[4]  Of course, Plaintiffs signed waivers that released their ADEA claims, and all parties agree that these waivers are valid under the OWBPA requirements for individual terminations.  But if what occurred here was actually a group termination in disguise, as Plaintiffs contend, the waivers are invalid because they failed to comply with the additional requirements that the OWBPA imposes on group terminations.  Hershey maintains that Plaintiffs' terminations were individual and made for performance reasons, and as such that Plaintiffs have validly waived their ability to pursue the ADEA claims of the instant action. As the party asserting the validity of the waivers, Hershey must bear the burden of proving that the waivers were knowing and voluntary.  See 29 U.S.C. § 626(f)(3).

### A.     Plaintiffs Frazier, Nelson, DeLaRue, Wasson, and Weeks[5]

Accepting Plaintiffs's best possible version of the facts, there is no genuine question that plaintiffs Frazier, Nelson, DeLaRue, Wasson, and Weeks[6] were not part of any group termination and thus validly waived the ADEA claims they seek to press in the instant suit. Accordingly, Hershey's Motion for Summary Judgment is GRANTED with respect to these Plaintiffs.

There is no clear definition of "an exit incentive or other employment termination program" under 29 U.S.C. § 626(f)(1)(H), but that does not mean the Court is left without guidance.  See Order re Mot. Summary Judgment (dkt. 71), 2012 WL 5412031 (N.D. Cal. Nov. 6, 2012); Suhy v. AlliedSignal, 44 F. Supp. 2d 432, 434–35 (D. Conn. 1999).  "[T]he legislative history of the OWBPA provides clear guidance" as to whether a termination was part of such a program, as do EEOC regulations and case law.  See id. at 435.  The legislative history states:

> In the context of ADEA waivers, the Committee recognizes a fundamental distinction between individually tailored separation agreements and employer programs targeted

---

[4]  With apologies to William Shakespeare, Hamlet, act 3, sc. 1.

[5]  Factual events discussed in this section are referenced and cited in further detail in the preceding Background section.

[6]  Plaintiffs Bolle and Brombeck are situated differently and will be discussed separately in subsequent sections.  Accordingly, references to the "Plaintiffs" in this section refer to Frazier, Nelson, DeLaRue, Wasson, and Weeks.

at groups of employees. Individual separation agreements are a result of <u>actual or expected adverse action against an individual employee</u>. The <u>employee understands that the action is being taken against him</u> and he may engage in arms-length negotiation to resolve any differences with the employer.

Group termination and reduction programs stand in stark contrast to the individual separation. During the past decade [the 1980s], in particular, employers faced with the need to reduce workforce size have resorted to standardized programs designed to <u>effectuate quick and wholesale reductions</u>. The trademark of involuntary termination programs is a <u>standardized formula or package</u> of employee benefits that is available to more than one employee . . . [T]he terms of the programs generally are not subject to negotiation between the parties. In addition, employees affected by these programs have <u>little or no basis to suspect that action is being taken based on their individual characteristics</u>. Indeed, the employer generally advises them that the termination is not a function of their individual status. Under these circumstances, the need for adequate information and access to advice before waivers are signed is especially acute.

S. Rep. No. 101–263, at 63–64 (1990), reprinted in 1990 U.S.C.C.A.N. 1509 (emphasis added).

EEOC regulations elaborate that "[t]he question of the existence of a 'program' will be decided based upon the facts and circumstances of each case." Waiver of Rights and Claims under the ADEA, 29 C.F.R. § 1625.22(f)(1)(iii)(B). "A 'program' exists when an employer offers additional consideration for the signing of a waiver pursuant to an exit incentive or other employment termination (e.g., a reduction in force) to two or more employees." <u>Id.</u> "The terms of the [exit incentive or other employment termination] programs generally are not subject to negotiation between the parties." <u>Id.</u> "Often, when utilizing a 'program' an employer is attempting to reduce its workforce . . . in an effort to eliminate what it deems to be excessive overhead, expenses, or costs from its organization." 29 C.F.R. § 1625.22(f)(3)(ii)(C). As examples, "[i]nvoluntary reductions in force typically are structured along one or more of the following lines: (A) Facility-wide: Ten percent of the employees in the Springfield facility will be terminated within the next ten days; (B) Division-wide: Fifteen of the employees in the Computer Division will be terminated in December; (C) Department-wide: One-half of the workers in the Keyboard Department of the Computer Division will be terminated in December; (D) Reporting: Ten percent of the employees who report to the Vice President for Sales, wherever the employees are located, will be terminated immediately; (E) Job Category: Ten percent of all accountants, wherever

United States District Court
For the Northern District of California

1   the employees are located, will be terminated next week."  29 C.F.R.

2   §§ 1625.22(f)(3)(iii)(A)–(E).  Another example in the regulations posits that "Y Corporation

3   lost a major construction contract and determined that it must terminate 10% of the

4   employees in the Construction Division.  Y decided to offer all terminees $20,000 in

5   severance pay in exchange for a waiver of all rights."  29 C.F.R. § 1625.22(f)(4)(vii).

6   Finally, "[a]n involuntary termination program in a decisional unit may take place in

7   successive increments over a period of time." 29 C.F.R. § 1625.22(f)(4)(vi).

8        Distilled to its essential elements, this framework illustrates that an individual

9   termination is directed at an single employee who understands that the termination is directed

10  at him or her for personalized reasons, and thus might seek to resolve or negotiate the

11  termination.  See S. Rep. No. 101–263 at 63–64.  On the contrary, an employee who is

12  subject to a group termination is told that he or she is being terminated through no individual

13  fault, but rather as part of a quick and wholesale reduction of a group or department. See id.

14  These group terminations will generally be standardized, wholesale, and non-negotiable.  Id.

15  Predictably, they tend to involve a certain group or department, or a specified portion thereof,

16  being eliminated in a short time due to restructuring or other business reasons.  See 29 C.F.R.

17  § 1625.22(f)(1)(iii)(B).  The affected employees generally are told that the termination is not

18  a function of their individual status, and thus have little or no basis to suspect that action is

19  being taken based on their personal characteristics—including, possibly, impermissible ones

20  such as age.  See S. Rep. No. 101–263 at 63–64.  This heightens the need for adequate

21  information before the right to assert those claims is waived.  See id.

22       Turning to the facts at hand, the record makes the following things clear.  As for age

23  discrimination, Plaintiffs appear to assume that because Hershey allegedly targeted longer-

24  tenured workers, and the passage of years in a particular role also made those employees

25  older, Hershey violated the ADEA.  This is not a tenable ADEA claim on the evidence in this

26  record.  In Hazen Paper Co. v. Biggins, 507 U.S. 604, 608–09 (1993), the Court held that

27  "there is no disparate treatment under the ADEA when the factor motivating the employer is

28  some feature other than the employee's age," even if the employer "act[s] on the basis of a

United States District Court
For the Northern District of California

factor, such as an employee's pension status or seniority, that is empirically correlated with age."  A "disparate treatment case, [in which] liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision," "captures the essence of what Congress sought to prohibit in the ADEA": that "an older employee [is] fired because the employer believes that productivity and competence decline with old age."  Id. at 610.  But "[w]hen the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears . . . even if the motivating factor is correlated with age."  Id. at 611.  This includes years of service.  Id.  "On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service."  Id.  As an example, "[a]n employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, see 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired.  Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based." Id.  Many employers, from the military to private law firms and others, follow this "up or out" model.  Thus, even if Plaintiffs had not waived their ADEA claims, the Court sees nothing in the "Career Planning Project" on this record that suggests age discrimination.

As for the threshold question whether Frazier, Nelson, DeLaRue, Wasson, and Weeks waived any age discrimination claims, the parties agree that the waivers are valid if these Plaintiffs were terminated on an individual basis.  They unquestionably were.  It comes as no surprise, then, that these Plaintiffs' terminations look nothing like the group terminations seen in the case law, without any exception of which this Court is aware, and fit nowhere within OWBPA's statutory and regulatory template.  A few examples are illustrative.  In Suhy, where the employer argued that a group termination was actually individualized, the court disagreed because the employer's "acknowledgment that the lay-off was part of a reduction in force is indicative of the nature" of the termination.  44 F. Supp. 2d at 435.

19

United States District Court
For the Northern District of California

1   There, the employer notified forty employees in December 1994 that they were being laid off

2   in connection with a reduction in the workforce due to a corporate merger, and gave the

3   plaintiff "no indication . . . that [he] was released because of his individual work

4   performance." Id.   Similarly, in Burch v. Fluor Corp., 867 F. Supp. 873, 877 (E.D. Mo.

5   1994), the court found that a group termination had occurred where the terminations involved

6   a twenty-five percent reduction in force in which the plaintiffs were notified that their

7   discharge was not a reflection on their performance.  And in Hankins v. Transcanada USA

8   Services, Inc., 22 F. Supp. 3d 844, 857 (M.D. Tenn. 2014), the district court rejected

9   defendant's argument that an individualized termination had occurred where the company

10  had advised the plaintiffs that their "terminations were unrelated to their individual status,

11  but were the results of [a] reorganization."

12         On the record here, in contrast, the factual question whether these Plaintiffs were

13  terminated as part of a group program can be answered only one way: they were not.  This is

14  not a matter of the Court's unwillingness to accept Plaintiffs' assertions and their

15  characterizations of ambiguous facts.  On the contrary.  The Court accepts, for purposes of

16  this motion, that Hershey executives met in January 2010 to discuss their views that

17  employees were stagnating in certain positions that are meant to be "developmental" or

18  "transitional" positions; that as part of this meeting managers were directed to consider

19  which stagnant employees had the skills or experiences to be promoted into more advanced

20  roles, and to terminate those that did not; and that directly or indirectly related to this effort,

21  Plaintiffs were identified as being long-tenured in their roles with little ability to advance and

22  were terminated.  That, in roughest summary, is the evidence in the light most favorable to

23  the Plaintiffs, and the Court accepts it as true for purposes of Hershey's motion.

24         But that narrative is not evidence of a group termination under the individualized facts

25  and circumstances of this case.  See 29 C.F.R. § 1625.22(f)(1)(iii)(B).  One glaring factor is

26  the time period over which these terminations took place.  Of course, "[a]n involuntary

27  termination program in a decisional unit may take place in successive increments over a

28  period of time." 29 C.F.R. § 1625.22(f)(4)(vi).  From the regulatory examples, the Court can

20

imagine scenarios in which a company might terminate ten percent of the employees in a particular facility in each of the next three quarters, for example, or five percent of employees after the completion of each phase of a contract.  Cf. 29 C.F.R. §§ 1625.22(f)(3)(iii)–(iv).  Here, in contrast, each Plaintiff in this group was terminated on his or her own, at different times that spanned over many months, with no apparent groupings or waves of terminations or other unifying factors.  Each reported to a different supervisor, who individually made the decision to terminate a single Plaintiff.  One worked in Ohio, another in New Hampshire, in Arizona, Mississippi, and Tennessee.  In fact, these Plaintiffs appear to have nothing in common other than their similar ranks within the Hershey hierarchy, their varied histories of negative performance ratings, and their age category—a "group" only in that they all were handpicked by counsel from the many individual terminations of Hershey employees across the country in nearly a years' time.  Additionally, no evidence indicates that Hershey was "attempting to reduce its workforce . . . in an effort to eliminate what it deem[ed] to be excessive overhead, expenses, or costs from its organization."  See 29 C.F.R. §§ 1625.22(f)(3)(ii)(C)–(D).  On the contrary, Hershey replaced each of the terminated Plaintiffs.  That Hershey refused to remove the age discrimination claim waiver from Briselli's Release or increase Wasson's severance payment at the request of each of those Plaintiffs' lawyers cannot, without more, convert their individualized severance packages into a standardized group termination program "generally not subject to negotiation between the parties" as envisioned by 29 C.F.R. § 1625.22(f)(1)(iii)(B).

And finally, the fact that each of these Plaintiffs was told that he or she wad being terminated for individual reasons stands in stark contrast to every case on this issue of which the Court is aware.  Of course, the Court doubts that Hershey could validly convert a group termination into individual terminations merely by concocting pretextual performance deficiencies at the eleventh hour.  But here, the importance of the individualized explanation given to each Plaintiff is twofold.  First, the aforementioned legislative history of the OWBPA contemplates that "the need for adequate information and access to advice before

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   waivers are signed is especially acute" in the group termination context because those

2   employees "have little or no basis to suspect that action is being taken based on their

3   individual characteristics[—i]ndeed, the employer generally advises them that the

4   termination is not a function of their individual status." S. Rep. No. 101–263, at 63–64.

5   Under those circumstances, employees would lack the information they need to make an

6   informed waiver of their age discrimination claims. See id. Here, in contrast, no Plaintiff

7   was under the illusion that his or her termination was for abstract corporate reasons beyond

8   his or her control; rather, each had the information he or she needed to evaluate whether the

9   cited performance reasons were a cover for age discrimination, and chose to waive those

10  claims in exchange for payment. Cf. Suhy, 44 F. Supp. 2d at 435 (plaintiff was told he was

11  being terminated as part of reduction in force and had "no indication . . . that [he] was

12  released because of his individual work performance"); Burch, 867 F. Supp. at 877 (same);

13  Hankins, 22 F. Supp. 3d at 857 (same). And second, the evidence documenting a long

14  history of performance problems and unfulfilled Performance Improvement Plans in these

15  Plaintiffs' relationships with Hershey simply does not support the alleged disguised en masse

16  termination of older workers. What it does support is this, and only reasonably this: that, in

17  short, Hershey executives reminded its managers that part of their role was to promote high-

18  performing employees and terminate low-performing employees who had stagnated in

19  transitional roles without the skills or performance to advance. All these factors culminate

20  into the touchstone inquiry of the ADEA: that these Plaintiffs' waivers of the claims they

21  seek to press in this suit were "knowing and voluntary," 29 U.S.C. § 626(f)(1), and therefore

22  must be enforced.

23         **B.     Plaintiff David Bolle**

24         Compared to the aforementioned plaintiffs, Plaintiff David Bolle stands in the "stark

25  contrast" that the OWBPA's legislative history envisioned, see Sen. Rep. No. 101–263 at 32.

26  Accordingly, factual questions about his termination call this Court to DENY summary

27  judgment with respect to the validity of his waiver.

28         At the time of Bolle's termination in September 2010, Hershey cited Bolle's

1   performance plans in early 2009, while he was in his prior role, as the supporting reasons.

2   See Bolle Decl. (Ex. 75) at ¶ 18.  But Bolle's termination coincided with a restructuring of

3   the West Grocery Team, of which Bolle was a part.  A PowerPoint presentation dated April

4   14, 2010, proposed a restructuring of Vice-President Michael Weinstock's group, of which

5   both Bolle and co-Plaintiff Gregory Barnes (who is not a party to the instant motions) were

6   both part.  The presentation explained the need to "adjust [Hershey's] structure to facilitate

7   [its] mission," proposed a new structure that did not include Bolle or Barnes by name, and

8   stated that "West CDM responsibility change necessitates posting positions."  See

9   Restructuring Presentation April (Ex. 19) at Hershey 0009577 and 0009580.  Approximately

10  four months later, in August 2010, a set of PowerPoint slides captioned with the name of

11  Bolle's and Gregory Barnes's manager, Shannon Syms, proposed a series of options for

12  restructuring the West Grocery Team.  See Restructuring Presentation Aug. (Ex. 39).  The

13  scenarios proposed relocating co-Plaintiff Barnes, and at least one scenario removed Bolle

14  from the structure entirely.  See Restructuring Presentation Aug. (Ex. 39).  Bolle was then

15  terminated the following month, in September 2010, despite having received a performance

16  review as late as March of that year stating that his level of performance was effective.  See

17  Bolle Decl. (Ex. 75) at ¶¶ 17–18.

18      A reasonable factfinder could conclude from this series of events that Bolle was

19  terminated as part of the West Grocery restructuring, not for pretextual reasons involving a

20  resolved performance review from a different role over a year in the past.  The contemporary

21  restructuring of Bolle's West Grocery group, and the planning that led up to it in which Bolle

22  was included and excluded in various structures under consideration, raise genuine questions

23  of material fact about the nature of his termination.  And although Bolle was superficially

24  told that his termination stemmed from performance reasons, his longstanding solid

25  performance reviews could reasonably lead to the opposite conclusion.

26      **C.    Plaintiff James Bombeck**

27      James Bombeck is situated differently from his co-plaintiffs in that he was the only

28  one who was terminated as part of a conceded and unrelated group termination.  Although he

23

released his age discrimination claims via a waiver that ostensibly complied with the OWBPA's requirements for group terminations, he seeks to escape the effect of that waiver by arguing that technical deficiencies in that waiver's disclosures preclude its binding effect. Specifically, Bombeck argues that four misrepresentations invalidate the waiver: it represented that nineteen employees were considered for termination, when in fact only six were interviewed; it identifies the affected unit as the "sales specialty channels business group" when in fact Bombeck worked for the "specialty channel" group; it later erroneously refers to the "reorganization of the Field Sales business group," when Bombeck was not part of any "Field Sales business group; and it shows that three persons were "selected for termination," when in fact only two were actually terminated.  See Plaintiffs' Supplemental Brief (dkt. 270) at 3–5.

The term "organizational unit," like others not defined in this portion of the Act, should be interpreted on a case-by-case basis in light of the purpose of Act: to ensure that "workers who signed a waiver had a clear idea of what they were giving up, particularly that they had the ability to assess the value of the right to sue for a possibly valid discrimination claim."  See Raczak v. Ameritech Corp., 103 F.3d 1257, 1262–63 (6th Cir. 1997).  The Court also looks to the EEOC's regulations implementing the OWBPA, which help define these terms.  See 29 C.F.R. § 1625.22. "[T]he scope of the terms 'class,' 'unit,' 'group,' 'job classification,' and 'organizational unit' is determined by examining the 'decisional unit' at issue."  29 C.F.R. § 1625.22(f)(1)(iii)(C).  The regulations go on to define the term "decisional unit" as follows:

> A 'decisional unit' is that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver. The term 'decisional unit' has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program.

29 C.F.R. § 1625.22(f)(3)(i)(B).

Several examples in the regulations are illustrative.  See 29 C.F.R. §§ 1625.22(f)(3)(B)(ii)(B)–(E).  The correct decisional unit will be the entire facility if an

1    employer seeks to reduce its workforce at that particular facility and selects some employees

2    there for termination.  29 C.F.R. § 1625.22(f)(3)(ii)(C).  But if the employer undertakes to

3    reduce its workforce within a particular portion or subgroup of a facility, the decisional unit

4    will be only that sub-group of the workforce.  29 C.F.R. § 1625.22(f)(3)(ii)(D).  Importantly,

5    the decisional unit may be larger than one facility if an employer combines operations from

6    several facilities and considers employees across all those groups for termination.  29 C.F.R.

7    § 1625.22(f)(3)(ii)(E).

8            Although Hershey must bear the burden to prove the validity of a waiver, see 29

9    U.S.C. § 626(f)(3), the Court is mindful of two competing forces: that it "is in the interest of

10   a worker seeking to void a release to be dissatisfied with any methodology that the company

11   used in attempting to comply with clause (H)(ii)," while a company may "want to fiddle with

12   the definition to mask the possible evidence of age discrimination," see Raczak, 103 F.3d at

13   1263 (emphasis in original).  This tension led the Sixth Circuit to turn to OWBPA's

14   "touchstone": "if the employer provides information that purports to comply with the statute,

15   then the inquiry should move to the question of understandability," that is, "whether the

16   employer provided the required information in a form, whatever the exact nomenclature, that

17   is understandable to the average worker in voluntarily deciding to give up the right to sue."

18   Id. at 1263–64.  Of course, a "fail[ure] to provide the correct, mandated information" about

19   the decisional unit falls short of the "strict and unqualified requirement of the OWBPA" and

20   makes a release "ineffective as a matter of law."  Kruchowski v. Weyerhaeuser Co., 446 F.3d

21   1090, 1095 (10th Cir. 2006) (citing Oubre, 522 U.S. at 427–28).  But in determining what

22   exactly is the correct information about a decisional unit in a particular case, the

23   "ambiguous" nomenclature of 29 U.S.C. § 626(f)(1)(H) makes "a rigid and mechanical

24   interpretation of that provision [] inappropriate" to the extent it fails to consider whether the

25   employee could "understand and gauge the prospects of an ADEA claim."  Raczak, 103 F.3d

26   at 1259–60.

27           The Court concludes that Bombeck must be held to the Release he signed because it

28   represents a knowing and voluntary waiver that complied with the OWBPA requirements for

United States District Court
For the Northern District of California

1  a group termination.  Bombeck's first grounds of alleged invalidity—that the waiver

2  represented that nineteen employees were considered for termination when in fact only six

3  were interviewed—is puzzling.  <u>See</u> Plaintiffs' Supplemental Brief (dkt. 270) at 3–4.  The

4  record shows that, in the course of the reorganization of Bombeck's sales team and its merger

5  with another group, six CSEs were required to interview for new positions; of these, three

6  were selected for termination and three were placed in new positions, and multiple others

7  were required to relocate.  Bombeck faults Hershey for identifying the nineteen members of

8  the two merged teams as the "decisional unit," rather than identifying only the six individuals

9  who were required to interview to secure a new position or be terminated.

10      The Court sees no support for this odd approach, neither in the regulation nor in logic.

11  Those six individuals were not an otherwise neutral subset or division within the Hershey

12  structure to which a group termination was applied.  That is to say, nothing united those six

13  employees other than the fact that they were selected <u>from</u> the nineteen persons of the

14  merged teams as those up on the chopping block—finalists for termination, so to

15  speak—who thus had to secure a new position or be sent packing.  But the OWBPA requires

16  the employer to identify the unit from whence they came: here, the nineteen members of the

17  merged teams.  <u>See</u> 29 C.F.R. § 1625.22(f)(4)(v) ("If the terminees are selected from a subset

18  of a decisional unit, the employer must still disclose information for the entire population of

19  the decisional unit.  For example, if the employer decides that a 10% [reduction in force] in

20  the Accounting Department will come from the accountants whose performance is in the

21  bottom one-third of the Division, the employer still must disclose information for all

22  employees in the Accounting Department, even those who are the highest rated.").

23      Bombeck's citation to a different portion of the regulation is inapposite: "[I]f an

24  employer seeks to terminate employees by <u>exclusively</u> considering a particular portion or

25  subgroup of its operations at a specific facility, then that subgroup or portion of the

26  workforce at that facility will be considered the decisional unit."  <u>See</u> 29 C.F.R.

27  § 1625.22(f)(3)(ii)(D) (emphasis added).  But as previously explained, six were selected for

28  interviews from the nineteen, and there is no indication that those six were exclusively

United States District Court
For the Northern District of California

1  considered for termination simply because they were the ones selected for interviews from

2  the larger group.  Bombeck's circular logic notwithstanding, to identify only the portion of

3  six persons selected from the larger group as finalists for termination would defeat the

4  purpose of the "decisional unit" disclosure, which is "to reflect the process by which an

5  employer chose certain employees for a program and ruled out others from that program."

6  See 29 C.F.R. § 1625.22(f)(3)(i)(B).

7      Bombeck's other objections are similarly unavailing.  He notes that the disclosure

8  identified the affected unit as the "Sales Specialty Channels Business Group" when in fact

9  Bombeck worked for the "Specialty Channel Group."  See Plaintiffs' Supplemental Brief

10  (dkt. 270) at 4–5.  But this objection, related to his previous one, fails for similar reasons.

11  The record shows that Bombeck's group was merged with another to create the Sales

12  Specialty Channels Business Group, from which certain employees were selected for

13  displacement or organization.  Bombeck's argument that Hershey should have identified only

14  his pre-merger portion of the larger group, rather than the full unit from which the group

15  termination occurred, is at odds with the aforementioned disclosure requirement that the

16  employer identify the full decisional unit.  See 29 C.F.R. § 1625.22(f)(4)(v).

17      Next, Bombeck contends that the disclosure later erroneously refers to the

18  "reorganization of the Field Sales business group," when Bombeck was not part of any Field

19  Sales business group. See Plaintiffs' Supplemental Brief (dkt. 270) at 5.  But even if this

20  language should have been replaced by the more precise "Sales Speciality Channels Business

21  Group," the waiver did not identify this as the "decisional unit," which was described

22  correctly and included the job titles and ages of all individuals at issue.  This extra language

23  does not fall within a specific disclosure requirement of the OWBPA as outlined in 29 U.S.C.

24  § 626(f), all of which were satisfied by Bombeck's waiver.  He does not argue that this

25  superfluous nomenclature later in the document, even if erroneous, disrupted his

26  understanding of the correctly identified "decisional unit" or undermined his waiver's

27  "knowing and voluntary" nature, see 29 U.S.C. § 626(f)(1).

28      Finally, Bombeck argues that the disclosure identifies three persons as being "selected

United States District Court
For the Northern District of California

1  for termination," when in fact only two were actually terminated.  <u>See</u> Plaintiffs'

2  Supplemental Brief (dkt. 270) at 5.  But the record shows that three employees in fact were

3  selected for termination and presented with waivers and disclosures, after which one of those

4  individuals was able to secure a position following a sudden vacancy.  <u>See</u> Dieffenbach Tr.

5  (Brigham Decl., Dkt. 272, Ex. 2) at 113–15.  Nothing in the OWBPA appears to require

6  Hershey to update a disclosure that was correct when made.  <u>Cf.</u> 29 C.F.R.

7  § 1625.22(f)(4)(vi) (in the context of a group termination program that "take[s] place in

8  successive increments over a period of time," the employer has "no duty to supplement the

9  information given to earlier terminees so long as the disclosure, at the time it is given,

10  conforms to the requirements of this section.").

11      The parties do not dispute that Hershey complied with the disclosure requirements for

12  a group termination waiver in all other respects.  None of Bombeck's opportunistic quarrels

13  with the aforementioned portions of the disclosures undermine this Court's conclusion that

14  the waiver complied strictly with the OWBPA requirements for a group termination, and

15  Bombeck must be held to his bargain.  The waiver of his age discrimination claims is valid,

16  and Hershey's motion for summary judgment on this issue accordingly is GRANTED.

17  **IV.    CONCLUSION**

18      For the foregoing reasons, the Court GRANTS in part and DENIES in part summary

19  judgment, as follows:

20  •    DENIES Plaintiffs' Motion for Summary Judgment;

21  •    GRANTS Hershey's Motion for Summary Judgment with respect to Plaintiffs Frazier,

22      Nelson, DeLaRue, Wasson, and Weeks;

23  •    DENIES Hershey's Motion for Summary Judgment with respect to David Bolle; and

24  •    GRANTS Hershey's Motion for Summary Judgment with respect to James Bombeck.

25      **IT IS SO ORDERED.**

26

Dated: July 9, 2015

27                                          _____
                                           CHARLES  R. BREYER
                                           UNITED STATES DISTRICT JUDGE
28