IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY P. BARNES, ET AL.,<br><br>    Plaintiffs,<br><br>v.<br><br>THE HERSHEY COMPANY,<br><br>    Defendant. | No. 3:12-cv-01334-CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' INDIVIDUAL CLAIMS** |

Three remaining Plaintiffs—who did not sign group termination waivers—allege individual disparate treatment claims against Hershey under the ADEA. See Opp'n (dkt 296); see also Order (dkt. 276). Hershey has filed this Partial Summary Judgment Motion on Plaintiffs' Individual Claims (dkt. 289). For the following reasons, the Court concludes that Plaintiffs Barnes and Bolle have raised genuine disputes of material fact on their individual claims, and the Court thus DENIES the motion as it relates to them. The Court further concludes that Plaintiff Chapman has not raised a triable issue of fact on his retaliation and constructive discharge claims, and the Court GRANTS Defendant's motion as to Chapman.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A separate Order addressing Hershey's Motion for Summary Judgment on Pattern and Practice and Disparate Impact Claims, see Order (dkt. 337), outlines the full facts of this age discrimination action against Hershey. This Order solely addresses whether triable issues of fact—drawn from a record viewed in the light most favorable to the three individual

Plaintiffs here—justifies allowing those three Plaintiffs to proceed to trial.

### A. Background on Plaintiffs Barnes and Bolle

Greg Barnes was a Category Development Manager ("CDM") at Hershey. See Barnes Decl. (dkt. 298) ¶ 13. Barnes was terminated in March 2011. See Barnes Decl. ¶ 43. David Bolle had a long career with Hershey and held a number of positions, but, beginning in 2009, he was a CDM as well. See Bolle Decl. (dkt. 299) ¶¶ 3-8. Bolle was let go as part of an alleged restructuring in 2010. See Bolle Decl. ¶¶ 27–30.

### B. Background on Plaintiff Chapman's Termination

Chapman worked as a Hershey Customer Service Executive ("CSE") in Georgia until he resigned from that position in July 2013. See Complaint (dkt. 102) ¶ 95. As a CSE, Chapman's job responsibilities were to "profitably grow . . . Hershey business to achieve the assigned objective/plan, including net sales, market share, trade spend, [and] sales activity margin." Chapman Tr. (dkt. 290-10) 45:9-12; see also CSE Job Description, Brigham Decl., Ex. 25 (dkt. 290-25). Chapman's sales volume was an important component of his job performance. See Chapman Tr. 46:4-22, 48:15-19.

In November 2010, Chapman began reporting to Michael Burkett. See Chapman Decl. ¶¶ 15–16. According to Chapman, he told Burkett in July 2011 that he wanted to work for Hershey for 8-10 more years, and Burkett responded that would not be possible. See Chapman Tr. 67:2-68:8; 72:1-7.

Beginning in 2011, Chapman's performance began to decline. See Chapman Tr. 226:1-227:10; Chapman 2011 Review, Brigham Decl., Ex. 28 (dkt. 290-28). Chapman failed to meet a number of sales goals at around that time.[1] Id.; Chapman Decl. ¶ 24. Burkett nonetheless gave Chapman a performance rating of "Successful" for 2011. Id. In December 2011, Chapman presented a business plan for 2012 to Burkett and Burkett's supervisor, William Rossi. Chapman Decl. ¶ 26; Burkett Tr. (dkt. 290-26) 49:11-20, 50:5-53:23;

---

[1] Chapman offers a number of explanations for his failure to meet his sales goals, but his explanations do not change the undisputed record upon which Hershey relies, and as explained below, those explanations do not alter the undisputed fact that his supervisors took issue with a business plan he presented in December 2011. See, e.g., Plaintiff's Surreply (dkt. 330) at 12–14.

2

54:18-55:6; 56:2-7. The plan failed to identify how Chapman would meet his sales goals. Id. Burkett privately informed Chapman that both he and Rossi were extremely disappointed with the presentation. Burkett Tr. 56:8-19; Chapman Tr. 70:25-71:6.

Chapman asserts that after December 2011, Burkett began to micromanage and scrutinize Chapman's work like never before. Chapman Tr. 75:14-21. Chapman states that Burkett sent him "constant emails questioning everything [he did], daily flashes of the numbers [sales results], needing information on everything . . . [and was] watching everything [he] did." Id. at 76:23-77:14. Chapman considered these communications about his performance and sales to be "constant harassment." Id. at 82:6-25. At the same time, Chapman's performance continued to decline; he again failed to make his sales goals by a significant margin. Id. at 213:19-214:19, 220:10-24; 01/31/2012 and 04/20/2012 Emails, Brigham Decl. Exs. 29 (dkt. 290-29), 30 (dkt. 290-30), 31 (dkt. 290-31). Burkett continued to push Chapman to make his goals in light of his poor sales performance; Chapman believed this indicated that he was heading toward termination. Burkett Tr. 54:13-21; Chapman Tr. 92:15-19, 199:24-200:13, 203:1-9; 01/31/2012 Emails and Chapman Review, Brigham Decl. Exs. 29, 30, 32. By May 2012, Chapman had fallen further behind on his sales goals. Chapman Tr. 222:2-17; Brigham Decl. Ex. 33 (dkt. 290-33). Burkett notified Chapman with a cover email stating: "We need to talk. Please review and give me a call." Brigham Decl. Ex. 33. Seven days later, Chapman took a medical leave of absence due to alleged stress. Chapman Tr. at 82:6-25.

During his leave of absence, in late May or early June 2012, Chapman reported certain concerns about Burkett to a Hershey human resources representative. Chapman Tr. 86:9-88:18; 92:15-19. Chapman reported that Burkett had contacted him during his leave of absence and also mentioned that he heard Burkett had questioned his decision to take MBA classes in 2012 because "[h]e should know his days with Hershey . . . are numbered." Id.

Chapman returned from medical leave in early July 2012, and his sales continued to decline. Chapman Tr. 82:10-25, 83:18-84:12. He missed his 2012 sales volume goal by a significant margin—more than $500,000—which exceeded any other team members' failure

1   to meet their goals. Id. 203:7-12, 209:1-8; Chapman 2012 Review, Brigham Decl. Ex. 32
2   (dkt. 290-32); Chapman 2012 Discussion Documentation, Brigham Decl. Ex. 34 (dkt. 290-
3   34). In December 2012, Chapman acknowledged that he was "dragging the team" down.
4   See 12/14/2012 Email, Brigham Decl. Ex. 35 (dkt. 290-35); Chapman Tr. 227:20-229:2.

5   As a result of Chapman's performance issues, Burkett assigned Chapman a
6   performance rating of "Developing" for 2012. See 2012 Chapman Review, Brigham Decl.
7   Ex. 32 (dkt. 290-32); Burkett Tr. 66:5-17, 80:2-8; 89:7-15, 118:10-120:15. Chapman's poor
8   performance continued in 2013; he missed his goal for the first quarter of 2013 by $6,600
9   and missed April's and May's goals by $52,000 and $99,000, respectively. See Tr. of June
10  7, 2013 Call, Brigham Decl., Ex. 36 (dkt. 290-36); Chapman Tr. 252:12-254:2. In June
11  2013, Chapman was placed on a Performance Improvement Plan ("PIP"). See Chapman PIP,
12  Brigham Decl., Ex. 37 (dkt. 290-37); Chapman Tr. 232:20-22.

13  Chapman told human resources that he had concerns about the accuracy of some of
14  the information in his performance plan document. See Chapman Tr. 97:23-98:22; June 13th
15  Recording, Brigham Decl., Ex. 38 (dkt. 290-38). To address these concerns, Hershey
16  slightly revised the PIP. See Chapman Tr. 238:3-8; 06/13/2013 and 06/27/2013 Emails,
17  Brigham Decl., Ex. 39 (dkt. 290-39), Ex. 40 (dkt. 290-40). Human resources assured
18  Chapman that the purpose of the PIP was to help him to get back on track. See June 13th
19  Recording, Brigham Decl., Ex. 38 (dkt. 290-38). Hershey management later affirmed that
20  their goal in placing Chapman on the PIP was to improve his performance and to help him
21  succeed. See Burkett Tr. 120:16-122:14; Rossi Tr. 104:19-25. Chapman concedes that the
22  goals in the PIP were appropriate, achievable, and reasonable. See Chapman Tr. 234-237.
23  He further admitted that no documents support his allegation that the PIP was retaliatory.
24  See Chapman Tr. 102:5-105:14. Nonetheless, Chapman resigned on July 11, 2013.
25  Chapman Tr. 233:2-4, 246:16-247:6; Chapman Resignation, Brigham Decl., Ex. 42 (dkt.
26  290-42).

**II.   LEGAL STANDARD**

The Court can grant a motion for summary judgment "if the movant shows that there

4

1 is no genuine dispute as to any material fact and the movant is entitled to judgment as a
2 matter of law." Fed. R. Civ. Proc. 56(a).  A principal purpose of summary judgment "is to
3 isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317,
4 323–24 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could
5 return a verdict" for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
6 A fact is material if it could affect the outcome of the suit under the governing law. Id. at
7 248–49 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).
8 Moreover, if the evidence presented is "merely colorable" and not "significantly probative,"
9 the court may decide the legal issue and grant summary judgment. Id. at 249–50 (citations
10 omitted).  To determine whether a genuine dispute as to any material fact exists, the court
11 must view the evidence in the light most favorable to the non-moving party. Id. at 255.

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal citation omitted).  Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." See id.

## III. DISCUSSION

Plaintiffs' each advance disparate treatment claims under the ADEA. See Opp'n at 19.  In a disparate treatment case, Plaintiffs "must produce evidence that gives rise to an inference of unlawful discrimination, either through direct evidence of discriminatory intent or through the burden shifting framework set forth in McDonnell Douglas." See Vasquez v. Cnty. of L.A., 349 F.3d 634, 640 (9th Cir. 2003).  "Under the McDonnell Douglas framework, a plaintiff must carry the initial burden to establish a prima facie case that creates an inference of discrimination." France v. Johnson, 795 F.3d 1170, 1173 (9th Cir. 2015), as amended on reh'g (Oct. 14, 2015).  "The burden of establishing a prima facie case of disparate treatment is not onerous." See Lyons v. England, 307 F.3d 1092, 1112 (9th Cir. 2002).  On summary judgment, the degree of proof necessary to establish a prima facie case "is minimal and does not even rise to the level of a preponderance of the evidence." See

5

1  Schechner v. KPIX–TV, 686 F.3d 1018, 1025 (9th Cir. 2012).

2  If the employee establishes a prima facie case, an inference of discrimination arises
and the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for
its employment action.  France, 795 F.3d at 1173.  If the employer does so, the burden shifts
back to the employee to prove that the employer's explanation is a pretext for discrimination.
Id.  The Ninth Circuit has stated that "a plaintiff's burden to raise a triable issue of pretext is
hardly an onerous one . . . it should not take much for a plaintiff in a discrimination case to
overcome a summary judgment motion."  Id. at 1175.  For the following reasons, the Court
concludes that individual Plaintiffs Barnes and Bolle have established triable issues of fact
involving their disparate treatment claims—Chapman has not.

### A.  Triable Issues of Fact Exist as to Barnes' And Bolle's Individual Claims

The Court concludes that Barnes and Bolle have shown genuine disputes of material
fact on their individual disparate treatment claims.  The Court thus DENIES Defendant's
motion as it relates to Barnes' and Bolle's individual disparate treatment claims.[2]

### B.  Lack of Triable Issues of Fact Involving Chapman's Claims

Unlike Barnes and Bolle, Chapman resigned from his job at Hershey.  Chapman Tr.
233:2-4, 246:16-247:6; Chapman Resignation, Brigham Decl., Ex. 42.  He raises a disparate
treatment claim based on the theory that (1) Hershey retaliated against him for complaining
to human resources about management, and (2) Hershey constructively discharged him.  See
Opp'n at 29.  The Court concludes that both arguments fail based on undisputed evidence.

#### 1.  Chapman's Retaliation Claim Fails on the "Causation" Element

To state a prima facie retaliation claim under the ADEA, Chapman must show: 1) he
engaged in a protected activity; 2) he suffered an adverse employment decision; and 3) there
was a causal link between the protected activity and the adverse employment decision.
Villiarimo v. Aloha Is. Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002).  If that showing is

---

[2] To the extent that Barnes, Bolle, or Chapman rely on statistical evidence regarding Plaintiffs' pattern and practice or disparate impact claims to support their individual claims, this Order incorporates the Pattern and Practice Order's conclusion that Plaintiffs' statistical evidence is inadequate.  See Order on Pattern and Practice and Disparate Impact Claims (dkt. 337).

6

made, the McDonnell Douglas burden shifting scheme applies. Id.  The burden shifts to Hershey to produce evidence supporting a legitimate, nondiscriminatory reason for the adverse action, and if it makes that showing, the burden shifts back to Chapman to show that Hershey's proffered reason is pretextual. Id.

The undisputed summary judgment record shows that Hershey's concerns with Chapman's performance began in December 2011, at which time Chapman presented a business plan indicating that he would not meet the sales goal set by the company. Chapman Decl. ¶ 26; Burkett Tr. 49:11-20, 50:5-53:23; 54:18-55:6; 56:2-7; Chapman Tr. 70:25-71:6. Chapman asserts that Burkett began to "micromanage and scrutinize" him at this time—a time which preceded Chapman's engagement in any protected activity. Id.  It was only after this scrutiny and management began that Chapman reported any concerns about Burkett to human resources. See, e.g., Opp'n at 30 n.17 (noting that Burkett met with HR later in 2012).  Thus, undisputed evidence shows that Chapman cannot establish the "causation" element of a prima facie ADEA retaliation case. See Villiarimo, 281 F.3d at 1064; Larmanger v. Kaiser Found. Health Plan of the Nw., 585 F. App'x 578, 579 (9th Cir. 2014) (affirming summary judgment because corrective action and termination were "put in motion" before the protected activity took place and where corrective action and termination "were amply supported by legitimate concerns about [plaintiff]'s work performance").

### 2. Constructive Discharge Claim Fails

To establish constructive discharge, Chapman must show that his "working conditions . . . deteriorated, as a result of age discrimination, to the point that they [became] sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." See Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir. 2000).  He fails to establish a triable issue of fact on his constructive discharge claim for two reasons.

First, he has not established that to the extent "working conditions . . . deteriorated," that deterioration was "a result of age discrimination." Id. at 930.  The evidence Chapman submits in an attempt to show age discrimination involves discussions that various Hershey's

7

managers had with him about retirement. See, e.g., Opp'n at 29–30. But the Ninth Circuit has affirmed the grant of summary judgment in favor of an age discrimination defendant who asked an employee twice about when the employee was going to retire, reasoning that "questions regarding plaintiff's retirement plans are not sufficient to show constructive discharge or age discrimination." Rissetto v. Plumbers & Steamfitters Local 343, No. C-92-3652-DLJ, 1994 WL 124831, at *4 (N.D. Cal. Mar. 31, 1994), aff'd, 94 F.3d 597 (9th Cir. 1996). Chapman cites no contrary Ninth Circuit authority.

Second, Chapman's own admissions establish that he cannot meet the high bar[3] of showing that his working conditions deteriorated "to the point that they [became] sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." Brooks, 229 F.3d at 930. Chapman states that he left Hershey because of "differences with [his] supervisor." Chapman Tr. 179:10-13. But he admits that his discussions with Burkett were "pretty calm business discussions." Id. at 109:24-110:5; 110:15-19. Burkett never humiliated, publicly criticized, screamed at, or threatened Chapman. Id. at 109:15-23. Chapman further admits the emails that Burkett sent him were appropriate. Id. at 212:18-215:5-225:7; Burkett-Chapman emails, Brigham Decl. Exs. 29, 43–49. He admits that management never threatened to demote him or to cut his pay, nor was he ever told he was being fired or that he had a deadline by which he had to leave the company. Id. 44:12-13, 107:25-110:14. Furthermore, Chapman himself characterized the goals Hershey laid out in his PIP as reasonable and achievable. See Chapman Tr. 234-237.

Chapman supports his constructive discharge claim with evidence that (1) managers and human resources personnel asked him about his retirement plans, cf. Rissetto, 1994 WL 124831, at *4, and (2) after he began missing his sales targets, his supervisors managed him closely and eventually placed him on a Performance Improvement Plan. See, e.g., Opp'n at

---

[3] The exacting standard exists "for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether h[er] employment situation was intolerable." See Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007).

8

33–35. But the Ninth Circuit—in affirming the grant of summary judgment for an employer—has stated that harsh criticism and performance evaluations alone do not establish constructive discharge. See Steiner v. Showboat Operating Co., 25 F.3d 1459, 1466; Cecala v. Newman, 532 F. Supp. 2d 1118, 1168 (D. Ariz. 2007), aff'd, 379 F. App'x 584 (9th Cir. 2010) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.").

Consequently, Chapman has failed to show that a "reasonable person in [his] position would have felt that [he] was forced to quit because of intolerable and discriminatory working conditions." Steiner, 25 F.3d at 1465. The Court thus concludes that Chapman fails to establish a triable issue of fact on his constructive discharge claim.[4]

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiffs Barnes and Bolle have raised genuine disputes of material fact, and the Court thus DENIES Defendant's Partial Motion for Summary Judgement as it relates to their individual claims. The Court further concludes that Plaintiff Chapman has not raised a triable issue of fact on his retaliation and constructive discharge claims, and the Court GRANTS Defendant's Partial Motion for Summary Judgement as to Chapman's individual claims.

**IT SO ORDERED.**

Dated: January 15, 2016

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[4] Again, to the extent Chapman, Barnes, or Bolle rely on statistical evidence regarding Plaintiffs' pattern and practice or disparate impact claims to support their individual claims, this Order incorporates the Pattern and Practice Order's conclusion that Plaintiffs' statistical evidence is inadequate. See Order on Pattern and Practice and Disparate Impact Claims (dkt. 337).

9